IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCISCO BECERRA-ROBLES,<br><br>Defendant. | 8:17CR339<br><br>FINDINGS AND RECOMMENDATION |

This matter is before the Court on the Motion to Dismiss (Filing No. 22) filed by Defendant, Francisco Becerra-Robles. Defendant filed a brief (Filing No. 23) in support of the motion, the government filed a brief (Filing No. 28) in opposition, and Defendant filed a supplemental brief (Filing No. 31) in response. Defendant also filed an exhibit list with attachments (Filing No. 26) and a supplemental exhibit list with an attachment (Filing No. 30).

The Court held an evidentiary hearing on the motion on January 3, 2018. Defendant was present with his attorney, Joshua W. Weir. The government was represented by Assistant United States Attorney, Frederick D. Franklin. Department of Homeland Security Special Agent Mark Lee ("SA Lee") testified on behalf of the government. The Court received into evidence, without objection, Exhibits 101 through 114 offered by Defendant, and Exhibit 115 jointly offered by the parties. A transcript (TR.) of the hearing was prepared and filed on January 12, 2018. (Filing No. 37). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be granted.

## BACKGROUND

The facts in this case are largely undisputed. Defendant was convicted of an aggravated felony in 1992 or 1993 and was thereafter deported to Mexico. (TR. 8-9; Filing No. 23). Defendant reentered the United States sometime in 2000 and began living in Omaha, Nebraska. (TR. 12; Filing No. 23). Defendant's employment history is documented by the filing of W-2 and/or 1099 statements for the years 2001 through 2010 (Ex. 104-113), a 2011 Federal 1040 Schedule C (Ex. 114), and statements showing Social Security and Medicare taxes for the years 1985 through 1992, and 2000 through 2016. (Ex. 102-103). Defendant was also issued a social

security number and social security card (Ex. 101). Importantly, a form I-130, also known as a "Petition for Alien Relative" ("Petition") was filed with the U.S. Department of Justice, Immigration and Naturalization Service ("INS"), on Defendant's behalf by his father. The Petition was received by the Nebraska service center in Lincoln on April 30, 2001. (Ex. 115).[1]

SA Lee began his employment with the Department of Homeland Security ("DHS") in November 2003, and has been with Homeland Security Investigations ("HSI") in Omaha, Nebraska, since July 2007. (TR. 7, 27). SA Lee primarily investigates persons who have previously been removed from the United States and have illegally reentered the country. (TR. 7-8). SA Lee explained that currently, at least two divisions within the DHS deal with immigration: the United States Citizenship and Immigration Services ("USCIS") and Immigration and Customs Enforcement ("ICE"). However, prior to the creation of the DHS in 2003, the INS was the single agency that handled immigration matters. The INS was an agency within the Department of Justice ("DOJ"). (TR. 26-27). SA Lee testified that although the INS was one agency, there were separate departments within the INS, including an administrative division that reviewed immigration applications, and an enforcement division dealing with detention and removal, among other divisions. (TR. 24-25; 44-45).

SA Lee explained that ICE, and subsequently HSI, operates a tip line out of the Burlington, Vermont Law Enforcement Support Center, which tips are then disseminated to the applicable field office based on geographic location. (TR. 9). SA Lee testified that he first became aware of Defendant on August 4, 2017, when two anonymous tips received by the tip line in June 2017 were forwarded to the Omaha field office. (TR. 10-11, 14). The tips indicated that Defendant might be in Omaha, Nebraska. (TR. 10). Before receiving these tips, SA Lee had no prior knowledge of Defendant. (TR. 15).

SA Lee proceeded to investigate the tips and confirmed Defendant previously had been arrested and convicted of a felony and deported. (TR. 11). SA Lee also corroborated information shared in the tips regarding Defendant's ties to a business in Omaha and other personal information. (TR. 11-12). SA Lee testified Defendant had provided several addresses and appeared to own a house, a business, and several cars registered in his name. SA Lee

---

[1] This is the date the application would have been received. The stamp on the bottom left corner would indicate the "receipt" or "priority" date. The sticker bar code in the upper right corner indicates the service center as "LIN". There is a Nebraska service center in Lincoln and no others using the symbol LIN. (TR. 29).

testified that Defendant also appeared to be living under the name and date of birth that matched the information DHS had for Defendant in its files. (TR. 12). As part of his investigation, SA Lee searched for, but did not find, any application submitted by Defendant to legally reenter the United States. (TR. 12-13). SA Lee did confirm that in the late 1990s, Defendant appeared to attempt to reenter the United States under different names and dates of births on the southern border. (TR. 13). SA Lee conducted surveillance of Defendant's businesses and residential addresses to confirm Defendant's identity, and ultimately arrested Defendant at his business address (where he had apparently been living) in Omaha in October 2017. (TR. 13).

SA Lee prepared the criminal complaint filed against Defendant in this district on November 3, 2017. (Filing No. 1). An Indictment was returned on November 15, 2017, charging Defendant under 8 U.S.C. § 1326(a) for being a previously deported alien "found in" the United States without express consent of the Attorney General. (Filing No. 13). Defendant has now moved to dismiss the Indictment, arguing that the instant prosecution is time-barred by the five-year statute of limitations. (Filing No. 22). Specifically, Defendant argues that he was "found in" the United States by immigration authorities as early as April 30, 2001, when the INS received the Petition for Alien Relative filed by Defendant's father on behalf of Defendant. (Filing No. 31).

SA Lee testified that during his investigation in this case, he came across the April 2001 Petition[2] (Ex. 115) filed by Defendant's father. (TR. 16-17). SA Lee found the Petition in Defendant's "immigration A file," which SA Lee described is a "permanent record" of all things related to an individual's immigration status, including immigration applications filed by the individual or other people filed on their behalf. (TR. 17). SA Lee testified that when a petition is filed on behalf of an alien relative, immigration officials sometimes have the alien relative come to the office for an interview to verify information or answer questions, although interviews are not required in every case. (TR. 18). Based on SA Lee's review of the April 2001 Petition, he believes the examiner determined that the Petition required further information and therefore called Defendant for an interview. However, SA Lee does not recall seeing an interview notice in Defendant's alien registration file. (TR. 35). According to SA Lee's review

---

[2] SA Lee testified that the bottom left hand corner of the form in this case shows a revision date of 4/11/91, which pre-dates his HSI employment, but he is unaware of any further revisions to the form and generally the process remains the same.

3

of the Petition, Defendant did not appear for an interview on August 12, 2003, so the Petition was denied on that date. (TR. 21, 35; Ex. 115).

SA Lee testified that the Petition contained some misleading information and omitted some information that would have allowed the immigration examiner to "easily determine if [Defendant] had been previously deported;" for example, the Petition included Defendant's social security number but omitted his alien registration number.[3] The alien registration number would have permitted the examiner to "easily pull up [Defendant's] information" to determine that he had previously been deported. The Petition also includes information that Defendant had entered "without inspection," but listed 1985 as the date he entered, although he had been deported in the 1990s. (TR. 19-21). Finally, the Petition indicates Defendant has never been under immigration proceedings. (Ex. 115).

Nevertheless, SA Lee testified that review of the Petition might cause a reader, including the examining official, to believe that Defendant was indeed present in the United States. In fact, it appears that someone in an official capacity for the INS examining office handwrote on the Petition, "Appears beneficiary is in U.S." (TR. 19, 33; Ex. 115). Moreover, although Defendant's father may not have supplied Defendant's alien registration number, SA Lee testified that it appears the immigration official handwrote Defendant's alien registration number on the Petition on the same date it was denied, August 12, 2003.[4] (TR. 31-33; Ex. 115). The alien registration number handwritten by the immigration official on the Petition is the same alien registration number that was used in the removal proceedings against Defendant. (TR. 34). SA Lee testified that, had the examining immigration official run the alien registration number through their database, she would have found the prior removal order. (TR. 35). The Petition also contained Defendant's true name, listed that he was at an Omaha address, listed Defendant's true date of birth, listed Defendant's social security number, and noted that Defendant was married in Omaha on May 13, 2000, and that Defendant had a son born in Nebraska on January 21, 2001. Additionally, the preparer of the Petition indicated that the alien relative was in the

---

[3] The space on the form at C.10. was left blank. Alien registration numbers are used for government tracking of individuals and may not be known to such persons or their relatives. (TR. 30).

[4] Handwritten in the "Action Stamp" box is the statement, "Denied 8/12/03 Joann Howe/DAC." (Ex. 115).

United States and would apply for adjustment of status at the INS office in "Omaha, NE."[5] (TR. 36; Ex. 115). SA Lee testified that the examining immigration official "could have done possibly more investigation and . . . obtained [Defendant's] file and seen that he was previously deported." (TR. 32). Regardless of the above information, in SA Lee's opinion, the information contained in the Petition was not sufficient to notify an agent within the INS, acting with due diligence, of the previously deported alien's physical presence in the United States. (TR. 42-43).

## ANALYSIS

On November 15, 2017, Defendant was charged in the Indictment under 8 U.S.C. § 1326(a) for being a previously deported alien "found in" the United States without consent. (Filing No. 13). The statute of limitations for a non-capital federal offense is five years after commission. 18 U.S.C. § 3282. "The five-year statute of limitations for prosecutions under [8 U.S.C.] § 1326 begins running as soon as the offense is complete." *United States v. Gomez*, 38 F.3d 1031, 1034 (8th Cir. 1994). "The offenses of entry and attempted entry are complete when the deported alien enters or attempts to enter through a recognized INS port of entry." *Id.* However, unlike the offenses of entry or attempted entry by a deported alien, a "'found in' violation is a continuing violation that is not complete until the alien is 'discovered' by immigration authorities." *Id.* at 1034-35. In this case, Defendant argues that he was "discovered" by immigration authorities more than five years before the Indictment was filed, and thus the instant prosecution is time-barred. The government argues that DHS agents, acting diligently, could not have discovered Defendant's illegal presence in the United States prior to the 2017 anonymous tips. (Filing No. 28 at p. 4). Therefore, the question before the Court is, when was Defendant's presence in the United States, without permission, discovered by immigration authorities?

A two-part test is used to determine when an alien's presence is discovered by immigration authorities for prosecution under 8 U.S.C. § 1326(a). "First, the physical presence of the deported alien in the United States must be discovered." *Gomez*, 38 F.3d at 1036 (citing *United States v. Whittaker*, 999 F.2d 38, 41 (2d Cir. 1993). Second, "the identity and status of the previously deported alien" must be ascertained. *Id.* at 1036; see also *United States v. Diaz-*

---

[5] However, "Ciudad, Juarez" was supplied in the next sentence as the location where the relative would apply for a visa if the relative was not eligible for adjustment of status. (Ex. 115).

*Diaz*, 135 F.3d 572, 577 (8th Cir. 1998). The Eighth Circuit Court of Appeals in *Gomez* applied the two-part test to "decide exactly what must be known to the government before a defendant alien is 'found in' the United States." *Gomez*, 38 F.3d at 1036. In *Gomez*, a previously deported defendant surreptitiously without inspection reentered the United States and appeared at an INS legalization office on May 3, 1988. The defendant filed an INS form under a different name than the one under which he was deported, used "numerous false statements," and provided "virtually no truthful biographical data." However, the defendant did provide a set of fingerprints and the social security number he used before he was deported. Three years later, the defendant was implicated in a jewelry theft by a fingerprint left at the scene. Using the fingerprints in the defendant's file, the FBI and INS matched the defendant's fingerprints with his previous identity as a deported alien, and arrested him in February 1993. The defendant was indicted under 8 U.S.C. § 1326(a) on May 7, 1993, five years and four days after his visit to the INS legalization office. The defendant raised the five year statute of limitations as a defense.

With respect to the first prong of the two-part test, the Eighth Circuit in *Gomez* determined that the INS was aware of the defendant's physical presence on May 3, 1988, when he visited an INS legalization office and filed an application for temporary resident alien status. However, because the defendant provided information to conceal his true identity and status as a deported alien, the Court determined the defendant was not "found" on that date. *Gomez*, 38 F.3d at 1036-37.

The record in this case clearly demonstrates that the INS knew of Defendant's physical presence in the United States in 2001. The Petition for Alien Relative submitted by Defendant's father to the INS on April 30, 2001, contains consistent information indicating that Defendant was physically present in the United States. Moreover, unlike *Gomez*, the Petition is replete with accurate biographical information about Defendant, setting forth his true name, true date of birth, his social security number, his Omaha address, his marital status, and identified that Defendant had a child born in Nebraska in 2001. The Petition stated the Defendant had entered the United States "without inspection," and indicated that the he was in the United States and would apply for adjustment of status at the INS office in "Omaha, NE." Finally, the immigration official that reviewed the application noted, "Appears beneficiary is in U.S." The undersigned magistrate

judge concludes that immigration authorities[6] were certainly aware of Defendant's physical presence in the United States at the latest by August 12, 2003 (the date the examining INS official denied the Petition).

With respect to the second prong of the two-part test, as the court in *Gomez* stated, "The physical presence of any and every alien does not violate [8 U.S.C.] § 1326. Only the physical presence of a particular type of alien, that is, an alien who was previously deported, violates the statute." *Gomez*, 38 F.3d at 1036. The defendant in *Gomez* was not *actually* discovered to be a previously deported alien until the FBI and INS matched his fingerprints submitted at the INS legalization office with those in his previous alien file. However, for purposes of determining when the statute of limitations for a "found in" violation begins running, the Eighth Circuit concluded that *constructive* knowledge of the defendant's identity and status should be attributed to the INS since it possessed the "means by which the INS could determine [the defendant's] true identity and status as a deported alien." *Id.* at 1037-38 ("[W]e believe that the statute of limitations for a 'found in' violation should also begin running when immigration authorities could have, through the exercise of diligence typical of law enforcement authorities, discovered the violation.". . . We therefore hold that [defendant] was constructively 'found in' the United States, and the violation of § 1326 was completed at the instant the immigration authorities should have, through the exercise of reasonable diligence, discovered [the defendant's] true identity."). The Eighth Circuit ultimately concluded that the "earliest possible time at which the INS may have received reasonable notice" of defendant's identity and status was sixty-days after receiving the defendant's fingerprints in the INS legalization office, due to the time it took to process fingerprints. *Id.* at 1038.

---

[6] The undersigned agrees with the government's initial argument that Defendant's contact with federal government agencies such as the Social Security Administration or the Internal Revenue Service does not provide immigration authorities with notice of Defendant's physical presence in the United States and his status as a deported alien. (Filing No. 28). However, the government also suggests that because there were separate divisions within the INS itself responsible for processing applications and criminally enforcing immigration laws, notice of Defendant's presence cannot be attributed to immigration authorities. (TR. 48). The undersigned does not agree. SA Lee testified that the INS was a single agency prior the creation of the DHS in 2003, and thus in 2001 the INS constituted the only relevant "immigration authorities." See, e.g., *United States v. Gunera*, 479 F.3d 373, 377 (5th Cir. 2007)("In 1999, the INS constituted the 'immigration authorities,' with that agency holding responsibility for both processing and investigative functions."); *Fornalik v. Perryman*, 223 F.3d 523, 529 (7th Cir. 2000)("[T]he last we checked, the INS is one unified agency of the federal government, not a mare's nest of competing and autonomous actors."); *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996) ("In instances where the deported alien surreptitiously enters the country, and is later discovered by the INS, the statute of limitations does not begin to run until his presence *is discovered by the INS*.")(emphasis added).

In this case, the record demonstrates by the time that the Petition was denied on August 12, 2003, the INS possessed the means by which it could have determined Defendant's true identity and status as a deported alien. As stated above, the Petition provided the reviewing INS official with Defendant's true name, date of birth, social security number, Omaha address, and the information that he had entered the United States "without inspection," and that he would apply for adjustment of status in Omaha, NE. Although Defendant's father may not have supplied Defendant's alien registration number when he first submitted the Petition, as of August 12, 2003, the reviewing immigration official had apparently found Defendant's alien registration number associated with his prior removal proceedings and his immigration A file. As SA Lee testified, an alien registration number allows the immigration official examiner to "easily pull up [Defendant']s information" to find Defendant's related files and see that he had been previously deported. (TR. 20). In other words, had immigration officials conducted even a cursory investigation "with the exercise of diligence typical of law enforcement authorities," the basis for the present criminal prosecution would have been understood in 2003, at the latest. *Gomez*, 38 F.3d at 1037. It is clear that no such efforts were made until August of 2017, when SA Lee was assigned to the case and, using the same alien registration number, was able to determine that Defendant had been previously deported and had not received permission to reenter the United States. In fact, within three months of his assignment to this case, SA Lee was able to complete his investigation, cause Defendant to be arrested, prepare a prosecution report, and make the criminal complaint in this matter. Thus, by its identification of the same alien registration number no later than August 12, 2003, the INS "possessed both the information and the means necessary to determine [Defendant's] status as a deported alien." *Gomez*, 38 F.3d at 1037.

"[T]he statute of limitations for a 'found in' violation . . begin[s] running when immigration authorities could have, through the exercise of diligence typical of law enforcement authorities, discovered the violation." *Id.* at 1037. On the facts of this case, the undersigned magistrate judge finds that immigration authorities knew Defendant was physically present in the United States, knew Defendant's alien registration number, and through reasonable diligence could have "easily" discovered Defendant's identity and status as a deported alien. Therefore, at the latest, Defendant was "found in" the United States by immigration officials for purposes of this prosecution by August 12, 2003, and the statute of limitations was triggered on that date. Because the Indictment in this action was not filed until November 15, 2017, approximately

8

fourteen years later, it is barred by the applicable five year statute of limitations. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Laurie Smith Camp that Defendant's Motion to Dismiss (Filing No. 22) be granted.

Dated this 24th day of January, 2018.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.